## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT

### SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District | |
|---|---|---|
| Name *(under which you were convicted):* | | Docket or Case No.: |
| Place of Confinement: | Prisoner No.: | |
| UNITED STATES OF AMERICA<br>V. | Movant *(include name under which convicted)* | |

### MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging:

   _____

   _____

   _____

   (b) Criminal docket or case number (if you know): _____

2. (a) Date of the judgment of conviction (if you know): _____

   (b) Date of sentencing: _____

3. Length of sentence: _____

4. Nature of crime (all counts):

   _____

   _____

   _____

   _____

   _____

5. (a) What was your plea?  (Check one)

   (1)  Not guilty  ☐          (2)  Guilty  ☐          (3)  Nolo contendere (no contest)  ☐

6. (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

   _____

   _____

   _____

   _____

   _____

6. If you went to trial, what kind of trial did you have?  (Check one)          Jury ☐          Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?          Yes ☐          No ☐

8.  Did you appeal from the judgment of conviction?          Yes ☐          No ☐

9.  If you did appeal, answer the following:

(a) Name of court: _____

(b) Docket or case number (if you know): _____

(c) Result: _____

(d) Date of result (if you know): _____

(e) Citation to the case (if you know): _____

(f) Grounds raised: _____

_____

_____

_____

_____

_____

_____

(g) Did you file a petition for certiorari in the United States Supreme Court?     Yes ☐          No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

Yes ☐          No ☐

11. If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐          No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(b)  If you filed any second motion, petition, or application, give the same information:

(1)  Name of court: _____

(2)  Docket of case number (if you know): _____

(3)  Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐          No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:          Yes ☐          No ☐

(2)  Second petition:      Yes ☐          No ☐

(d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

_____

_____

_____

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** _____

_____

    (a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

    (b) **Direct Appeal of Ground One:**

        (1) If you appealed from the judgment of conviction, did you raise this issue?

            Yes ☐      No ☐

        (2) If you did not raise this issue in your direct appeal, explain why: _____

_____

    (c) **Post-Conviction Proceedings:**

        (1) Did you raise this issue in any post-conviction motion, petition, or application?

            Yes ☐      No ☐

        (2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

        (3) Did you receive a hearing on your motion, petition, or application?

            Yes ☐      No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

        Yes ☐          No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐          No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

**GROUND TWO:** _____

_____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(b)  **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐          No ☐

(2)   If you did not raise this issue in your direct appeal, explain why: _____

_____

**(c)  Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐          No ☐

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐          No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes ☐          No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐          No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this
issue: _____

_____

_____

_____

_____

_____

_____

**GROUND THREE:** _____

_____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

(b)  **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐      No ☐

    (2)  If you did not raise this issue in your direct appeal, explain why:

    _____

(c)  **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐      No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐      No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐      No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐      No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

**GROUND FOUR:** _____

_____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b)  **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐        No ☐

(2)   If you did not raise this issue in your direct appeal, explain why:

_____

_____

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐        No ☐

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐       No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐       No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐       No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

    (7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this
issue: _____

_____

_____

_____

_____

13.   Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which
ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

_____

_____

_____

_____

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the
    you are challenging?        Yes ☐        No ☐

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the
    issues raised. _____

    _____

    _____

    _____

    _____

    _____

15. Give the name and address, if known, of each attorney who represented you in the following stages of the
    judgment you are challenging:

    (a) At the preliminary hearing: _____

    _____

    (b) At the arraignment and plea: _____

    _____

    (c) At the trial: _____

    _____

    (d) At sentencing: _____

    _____

    (e) On appeal: _____

    _____

    (f) In any post-conviction proceeding: _____

    _____

    (g) On appeal from any ruling against you in a post-conviction proceeding: _____

    _____

    _____

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court
    and at the same time?        Yes ☐        No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are
    challenging?        Yes ☐        No ☐

    (a) If so, give name and location of court that imposed the other sentence you will serve in the future:

    _____

    (b) Give the date the other sentence was imposed: _____

    (c) Give the length of the other sentence: _____

    (d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or
    sentence to be served in the future?        Yes ☐        No ☐

18.   TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

-----

   * The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:
   A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of –
       (1)   the date on which the judgment of conviction became final;
       (2)   the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
       (3)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
       (4)   the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief: _____

_____

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ .

(month, date, year)

Executed (signed) on _____ (date)

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

_____

_____

_____

Page 13 of 13

## FACTUAL AND LEGAL ALLEGATIONS
## FOR 28 U.S.C. § 2255 RELIEF

## INTRODUCTION

1.     Jack Daly, the petitioner in this matter, respectfully moves this Court to vacate his conviction consistent with 28 U.S.C. § 2255. Mr. Daly pled guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Daly now contends that his plea resulted from ineffective assistance of counsel.

2.     Mr. Daly alleges that his counsel failed to provide effective assistance in several critical respects:

(a) Failing to advise him of a robust defense under the First Amendment compelled speech doctrine, which directly challenged the Government's theory that his failure to disclose Sheriff Clarke's public statements rendered the PAC's solicitations fraudulent. This argument not only highlights the Government's novel and untested application of fraud statutes to political speech but underscores the broader constitutional implications of criminalizing forward-looking statements and expressions of hope about a potential candidacy, statements long protected as political speech.

(b) Failing to advise Daly of the availability of a due process "fair warning" defense. Daly's conduct, including the Draft PAC's solicitations and FEC filings, occurred in a regulatory environment where no clear guidance or precedent existed to indicate that his actions violated criminal law. This lack of fair notice, compounded by the government's novel application of fraud

statutes to political speech, created a constitutional infirmity that counsel should have advised Daly about.

(c) Misadvising him about the availability of a statute of limitations defense, given that no overt acts furthering the conspiracy occurred within the limitations period. Counsel failed to emphasize that post-February 2018 filings were ministerial in nature and did not serve the conspiracy's objectives.

(d) Failing to challenge the factual basis of the plea, which was insufficient to support a conviction under the elements required for conspiracy to defraud the United States.

(e) Additionally, counsel failed to properly advise Mr. Daly about his right to withdraw the plea before the district court accepted it. Without a full understanding of the viable defenses available to him, including those under the First Amendment, Fifth Amendment's Due Process Clause, and statute of limitations, Mr. Daly was deprived of  the opportunity to make an informed decision about the exercise of his unilateral right to withdraw his plea.

3.      For these reasons, Mr. Daly respectfully seeks relief from his conviction because his counsel's errors and the Government's reliance on a novel and constitutionally fraught theory of prosecution undermined the fairness of the proceedings and his ability to present a meaningful defense.

## STATEMENT OF FACTS

### I. Background on the Federal Election Commission and Draft PACs

4.    The Federal Election Commission (FEC) is an independent regulatory agency created in 1975 under the Federal Election Campaign Act of 1971 (FECA). Congress established the FEC to administer and enforce campaign finance laws, including overseeing disclosure of campaign finance information, enforcing contribution limits, and monitoring the use of funds by political committees. See Federal Election Campaign Act of 1971, 52 U.S.C. § 30106.

5.    A political action committee (PAC) is a type of political committee defined under FECA as any group that receives contributions or makes expenditures exceeding $1,000 in connection with federal elections. See 52 U.S.C. § 30101(4); 11 C.F.R. § 100.5(a). Among the various types of PACs is the "Draft PAC," which is established solely to encourage a specific individual to run for federal office. Draft PACs occupy a distinct and speculative role within campaign finance. Their primary purpose is to build grassroots support to persuade an individual to become a candidate.

6.    Like other political committees, Draft PACs must comply with FECA's reporting and recordkeeping requirements. These include registering with the FEC using Form 1 (Statement of Organization) and filing periodic reports disclosing contributions and expenditures. See 52 U.S.C. §§ 30103, 30104; 11 C.F.R. §§ 102.2, 104.3.

7.      The FEC imposes limited rules specific to Draft PACs. A Draft PAC may include the name of the individual it seeks to draft in the name of the committee, but it must also clearly indicate that it is a draft committee. See 11 C.F.R. § 102.14(b)(2). Beyond this, the FEC has issued no substantive rules or guidance tailored to Draft PAC operations, leaving much of their regulatory treatment undefined.

## II. Formation of the Draft PAC and Its Purpose

8.      On January 19, 2017, Jack Daly registered the Sheriff David Clarke for U.S. Senate (Official Draft Campaign) Super PAC (the "Draft PAC") with the FEC. This registration included submitting Form 1, Statement of Organization, which identified Daly as the PAC's Chairman, Treasurer, and Custodian of Records. The stated purpose of the PAC was to encourage Sheriff Clarke, then the Sheriff of Milwaukee County, Wisconsin, to run for the U.S. Senate in the 2018 election.

9.      The Draft PAC's formation reflected Daly's genuine belief that Sheriff Clarke, with his national recognition and having won four countywide elections as the Democratic Party's nominee for Sheriff in Wisconsin's most populous county and largest media market, would be a formidable candidate for the Republican Party's nomination for U.S. Senate. Daly invested significant time and resources into the PAC, personally financing aspects of its operations and contributing donor data from his private business.

10.     The Draft PAC was formed in compliance with FEC regulations, including adopting a name that identified Sheriff Clarke while clearly indicating its status as

a draft effort. See 11 C.F.R. § 102.14(b)(2). Daly's early actions included consulting

an attorney specializing in FEC compliance and draft efforts, establishing bank

accounts, building a new media contact list heavy on Wisconsin media outlets,

contacting prominent Republicans to enlist help from others who also wished to

draft Sheriff Clarke, performing hundreds of hours of research to equip copywriters,

graphic designers, and coders to set up the website, securing a credit card

processing platform to process donations and a vendor to process the digital petition

signatures, securing the services of a reputable direct mail fundraising agency (the

same one that raised and spent tens of millions of dollars as part of the Draft Ben

Carson committee), and launching a campaign to raise and spend more than one

million dollars to identify more then one hundred thousand Americans who wanted

Clarke to run for Senate.

## III. Sheriff Clarke's Public Statements About Candidacy

11.     Between January and July 2017, Sheriff Clarke made a series of public and

private statements that appeared to vacillate on his interest in running for the U.S.

Senate. For example:

- In February 2017, Clarke stated in an interview that he would "never say

    never" regarding a potential Senate run.

- On March 3, 2017, during an appearance on Fox News, Clarke said, "I'm

    flattered by the energy and enthusiasm nationwide for such a thing. But

    that's why it's a draft movement at this point. They're going to have to get me

in there kicking and screaming right now. But I never say never. I haven't totally closed the door."

- On May 10, 2017, however, Clarke described a Senate run as "highly unlikely."

12.     On July 21, 2017, Sheriff Clarke gave a radio interview in which he stated that he was not running for the U.S. Senate, describing the speculation about his candidacy as an unwelcome distraction. During this interview, Clarke referred to a "scam PAC," urging listeners to "hang onto your money" and discouraging donations.

13.     However, Clarke did not specifically identify which PAC he was referring to, and evidence in the record suggests that there were multiple PACs, unrelated to Daly, claiming to support a potential Clarke candidacy at the time.

## IV. August and September 2017 Solicitations

14.     On August 2, 2017, the Draft PAC sent a direct mail solicitation. The solicitation did not reference Clarke's recent public statement indicating he would not run for Senate. Instead, it presented an optimistic and forward-looking narrative, typical of Draft PAC messaging, designed to galvanize donor support and petition signers.

15.     On September 2, 2017, the Draft PAC sent an additional solicitation via email. This message suggested that Clarke's resignation as Milwaukee County Sheriff would allow him to prepare "in earnest" for a Senate campaign. Like the

August solicitation, it omitted reference to Clarke's public statement that he would not run for the Senate.

16.     Both the August and September solicitations became central to the Government's fraud allegations, which focused on the failure to include disclaimers about Clarke's public statements and the representation of intended uses for donor funds.

## V. Clarke's September 2, 2017 Email to Daly

17.     Later that same day, Clarke e-mailed Daly stating, "Jack, what is this? You are well aware that I am NOT running for U.S. Senate. I announced that a month ago and you were contacted by a local newspaper writer about my announcement. Do NOT raise any more money using my name."

18.     Clarke received an e-mail in response, which was originally written by Pendley, which stated that Daly had stepped back from the PAC's operations, a new treasurer had taken over the PAC's management, and that the PAC was winding down its activities.

## VI. Post-September 2, 2017 Events and PAC Activities

19.     On September 7, 2017, the Draft PAC submitted an amended FEC Form 1, identifying Zachary Ryan Zynda as the new treasurer of the PAC. The filing listed an effective date of August 28, 2017.

20.     In January 2018 the PAC changed its name to the Bold Conservatives PAC, further removing any association with Clarke. See PSR ¶ 128.

## VII. Transition and Cessation of PAC Activities

21.    Following the name change in early 2018, the PAC received its last donation.

22.    Although the PAC ceased its fundraising efforts, it continued to submit FEC filings reflecting its inactivity, including reports that identified Zynda as treasurer. These filings maintained substantial compliance with federal reporting requirements despite the PAC's dormancy. See PSR ¶¶ 55–59.

23.    The PAC's administrative filings extended through October 2022, marking the effective winddown of the PAC.

## VIII. Subsequent Investigations and Legal Proceedings

24.    In 2022, investigators began scrutinizing the activities of the Draft PAC, focusing on the August and September 2017 solicitations, Daly's communications with Sheriff Clarke, and the accuracy of the PAC's FEC filings.

25.    Investigators interviewed individuals associated with the PAC, including Zynda, the intern listed as treasurer. Zynda asserted that his role was limited to agreeing to let his name be used on official filings and that he did not perform any substantive treasurer duties.

## IX. Plea Agreement and Subsequent Proceedings

26.    On April 27, 2023, Daly, was via a single-count information alleging conspiracy to defraud the United States under 18 U.S.C. § 371. The charge encompassed allegations related to the Draft PAC's final direct mail and e-mail solicitations, along with FEC filings which named Zynda as the treasurer. ECF No. 1.

27.     Daly entered into a plea agreement with the Government, agreeing to plead guilty to the conspiracy charge. ECF No. 2 at 2–4.

28.     On June 8, 2023, Daly appeared before a magistrate judge and formally entered a plea of guilty to the single-count information. During the plea colloquy, Daly affirmed his understanding of the charge, the terms of the plea agreement, and the potential penalties associated with his plea. The court subsequently recommended acceptance of Daly's guilty plea. See Plea Agreement, ECF No. 2 at 5.

29.     On June 28, 2023, the district court accepted Daly's guilty plea and adjudicated him guilty of conspiracy to defraud the United States.

30.     On December 15, 2023, Daly appeared before the district court for sentencing. During the proceedings, the Court addressed the Government's allegations and acknowledged the speculative nature of Draft PACs. The Court made clear that the Draft PAC's operations prior to Clarke's announcement in July 2017 were not problematic and did not form a basis for criminal liability. Sent. Tr. at 50 ("I have no quarrel with anything that occurred prior to that faithful day in July 2017 when David Clark told a radio host that he was not going to run for the office of US Senate").

31.     The Court also addressed the language in the solicitations regarding advertisements and how funds would be used. Rejecting the Government's characterization of this language as misleading, the Court observed that a statement like, "your $2,500 contribution will pay for a TV ad[]. I don't read that phrase as suggesting that if you give $2,500, I will use it personally for a TV ad[] for

David Clark[e]. It's simply an outline of what money is being spent for or will be spent for.." *Id.*at 51 (alterations added).

32.     Ultimately, Daly was sentenced to four months of imprisonment, followed by two years of supervised release, and was ordered to pay a $20,000 fine and $69,978.37 in restitution.

**Ground One: Ineffective Assistance of Counsel Related to the Guilty Plea**

> **Subground (a):     Counsel Failed to Advise Daly About the Compelled Speech Doctrine as a Defense**

33.     Daly's counsel failed to sufficiently consider a critical First Amendment defense rooted in the compelled speech doctrine. The Government's theory relied on the omission of Sheriff Clarke's July 21, 2017, public statement that he would not run for Senate in the Draft PAC's solicitations. By requiring the inclusion of disclaimers about Clarke's statement, the Government compelled Daly and the Draft PAC to convey a message that directly conflicted with the Draft PAC's advocacy. This constitutes compelled speech, which is presumptively unconstitutional under well-established First Amendment principles.

34.     In *Riley v. National Federation of the Blind*, the Supreme Court held that compelling speakers to include specific factual content in their communications "necessarily alters the content of the speech" and triggers strict scrutiny. *Riley v. National Federation of the Blind*, 487 U.S. 781, 795 (1988). This principle applies with particular force to political speech, which occupies a uniquely protected space under the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976) ("Discussion of public issues and debate on the qualifications of candidates are

integral to the operation of the system of government established by our Constitution.").

35.     The Government's theory that the Draft PAC's solicitations were fraudulent because they omitted Clarke's July 21 public statement that he would not run for Senate effectively transformed the Draft PAC's protected political advocacy into compelled speech. Draft PACs exist to generate grassroots enthusiasm for potential candidates, often using speculative or aspirational messaging to achieve their purpose. Mandating the inclusion of disclaimers highlighting a candidate's public statement would undermine a PAC's core advocacy and impose a government-mandated narrative that conflicts with its purpose.

36.     <u>Content-Based Regulation</u>: The compelled inclusion of disclaimers about Clarke's public statement constituted a content-based regulation of speech, requiring the Draft PAC to convey specific factual information that fundamentally altered the messaging of the Draft PAC itself. As the Court in *Riley* recognized, such regulations must satisfy strict scrutiny—a standard the Government could not meet here. The Government's asserted interest in preventing donor confusion could have been addressed through less intrusive means, such as public education about Draft PACs or enhanced guidance from the FEC, rather than compelling the Draft PAC to contradict its advocacy.

37.     <u>Ideological Conflict</u>: The Draft PAC's solicitations reflected an ideological and partisan commitment to encouraging Clarke to run for Senate. The compelled inclusion of disclaimers about Clarke's public statement would have imposed a

counter-message that stifled the PAC's ideological expression. This conflict is especially significant in the political sphere, where the First Amendment's protections are at their zenith. See *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018) (invalidating compelled speech requirements that interfered with advocacy).

38. <u>Chilling Effect</u>: The Government's approach risked chilling political advocacy by creating a precedent that discourages speculative or aspirational messaging. If compelled disclaimers are required to avoid legal liability, political organizations and PACs would be deterred from engaging in advocacy altogether, fearing the risk of prosecution for failing to meet unclear or overly burdensome standards.

39. <u>Lack of Narrow Tailoring</u>: Even assuming the Government had a compelling interest in requiring the kind of disclaimer that was the heart of the Government's case, its requirement was not narrowly tailored. Fraud statutes must be applied cautiously in the context of political speech to avoid overreach. Here, the Government could have pursued less restrictive alternatives, such as enhancing transparency requirements or clarifying FEC rules, rather than criminalizing the absence of disclaimers in the Draft PAC's solicitations.

40. Counsel's failure to identify and advise Daly about this viable defense constituted deficient performance under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reasonable attorney with knowledge of First Amendment jurisprudence would have recognized that the compelled speech doctrine barred the Government's fraud theory. Raising this defense would have formed the basis for a

meritorious pretrial motion to dismiss or a strong argument at trial, undermining the Government's case.

41.     The prejudice to Daly is evident. The compelled speech defense strikes at the heart of the Government's theory, challenging its novel application of fraud statutes to compel disclaimers in political solicitations. If properly advised, Daly would have contested the charges rather than plead guilty.

42.     The facts surrounding the Draft PAC's operations further support this defense. The solicitations in question did not reference Clarke's decision not to run but instead employed aspirational language consistent with the PAC's mission to galvanize support. Such rhetoric is typical of Draft PACs, which inherently operate in a speculative space to build momentum for potential candidates. Criminalizing this form of advocacy conflicts with First Amendment protections and demonstrates the Governmental overreach the charges in this case represent.

43.     Politicians often make public statements declaring they will not run for office, only to later reverse course. This political reality undermines the Government's argument that omitting Clarke's July 21, 2017, statement inherently misled donors. Public denials are frequently strategic, reflecting a candidate's short-term intentions or an effort to manage media and donor expectations, rather than a definitive decision. Daly's counsel failed to contextualize Clarke's statements within this broader political reality, leaving a critical defense unraised and unadvised about.

44.     Examples of politicians who initially declared they would run or not, only to later reverse their decisions, are abundant.

45.     Clarke's public statements fit squarely within this historical pattern. While he declared on July 21, 2017, that he would not run for Senate, his earlier statements left the possibility open. For example, in March 2017, Clarke stated, "I never say never. I haven't totally closed the door." See PSR ¶ 106. Politicians, including Clarke, often use such statements strategically, meaning their public denials do not preclude speculation or legitimate efforts by Draft PACs to encourage them to reconsider.

46.     The Draft PAC's solicitations reflected the speculative and aspirational nature of political advocacy. The messaging did not reference Clarke's July 21 statement but instead presented a vision of what could be, consistent with the PAC's purpose of building grassroots enthusiasm. Counsel's failure to identify this reality and its relevance to the compelled speech defense left Daly without a critical argument against the Government's theory.

47.     The chilling effect of such compelled disclaimers extends beyond this case, discouraging other political organizations and PACs from engaging in speculative advocacy. Again, political fundraising often involves aspirational language, and requiring disclaimers about a potential candidate's public statements risks stifling robust political debate. Counsel's failure to advise Daly of this defense deprived him of a meaningful opportunity to contest the charges and ultimately influenced his decision to plead guilty.

### Subground (b): Counsel Misadvised Daly About the Availability of a Statute of Limitations Defense

52.    Daly's counsel also failed to fully assess and advise him regarding the availability of a statute of limitations defense. To sustain a charge of conspiracy under 18 U.S.C. § 371, the Government was required to prove at least one overt act in furtherance of the conspiracy that occurred within five years of the charges. Counsel's failure to critically evaluate whether the alleged overt acts advanced the original objectives of the conspiracy or constituted a separate conspiracy deprived Daly of a viable defense.

53.    By late 2017, the Draft PAC had ceased soliciting funds tied to its mission of drafting Clarke to run for Senate. By January 2018, the PAC formally changed its name, further severing its connection to Clarke's potential candidacy. The Draft PAC's subsequent FEC filings bore no connection to advancing the alleged conspiracy's original objectives.

54.    Under *Grunewald v. United States*, 353 U.S. 391, 401–02 (1957), acts occurring after the central objectives of a conspiracy have been achieved do not qualify as overt acts capable of extending the statute of limitations. Here, the Government relied on routine FEC filings, including the September 2017 amendment naming Zynda as treasurer, as overt acts in furtherance of the conspiracy. However, these filings were not taken to advance any scheme but merely reflected procedural compliance with FEC rules.

55.    Counsel failed to appreciate the Government's conflation of administrative filings with acts furthering the alleged conspiracy. Actions such as filing FEC

reports after February 2018 were unrelated to the Draft PAC's solicitation activities, which had already ceased. These routine filings did not mislead donors, obstruct investigations, or advance any alleged scheme. Proper advice to Daly about the limited scope of the alleged conspiracy was critical to Daly assessing the viability of the limitations defense.

56.     Additionally, counsel did not fully consider or advise Daly of the argument that the Government's charge encompassed multiple objectives; namely, the solicitation activities and post-February 2018 administrative filings with the FEC were separate conspiracies—to the extent they were conspiracies at all.

57.     Had counsel properly assessed and advised Daly regarding these issues, he would not have pleaded guilty. Daly expressed significant reservations about the validity of the charges both before and after entering his plea, indicating his discomfort with admitting guilt to conduct he believed was not criminal.

58.     Under *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), prejudice in this context requires showing a reasonable probability that Daly would have insisted on going to trial if properly advised. The statute of limitations defense, combined with Daly's reservations about pleading guilty, demonstrates that such a probability exists. Daly's belief that the Government's case rested on legally insufficient grounds would have compelled him to contest the charges rather than plead guilty.

59.     Counsel's failure to emphasize the temporal and functional disconnection between the PAC's solicitation activities and its administrative filings left Daly without a critical defense to consider. This failure also undermined his ability to

make an informed decision about whether to plead guilty or proceed to trial. This was ineffective assistance.

60.     Proper advice regarding the statute of limitations defense, including the argument that the alleged overt acts were unrelated to the original conspiracy, would have materially influenced Daly's decision-making. Instead of pleading guilty, Daly would have had a viable basis to file a pretrial motion to dismiss or to proceed to trial with a strong defense against the Government's allegations. As such, there is a reasonable probability Daly would not have pleaded guilty and instead proceeded to trial.

### Subground (c):     Counsel Failed to Challenge the Factual Basis for the Plea

61.     Daly's counsel provided ineffective assistance by failing to challenge the factual basis for the guilty plea. Under 18 U.S.C. § 371, the Government must demonstrate (1) a conspiracy to defraud the United States, (2) an overt act in furtherance of the conspiracy, and (3) intent to obstruct the lawful functions of a government agency through dishonest means. The Department of Justice's (DOJ) own guidelines emphasize that § 371 conspiracies involving the Federal Election Commission (FEC) require proof of intent to impede or obstruct the agency's legitimate regulatory functions. Counsel failed to alert Daly and the Court that the charges and stipulated facts in connection thereto did not meet this heightened standard.

62.     The DOJ's Federal Prosecution of Election Offenses guidelines state that "prosecution under FECA's criminal provision requires proof that the defendant was

aware that his or her conduct was generally unlawful." However, in the context of a

§ 371 conspiracy, the guidelines require additional proof "that the defendant

intended to disrupt and impede the lawful functioning of the FEC. Indeed, the crux

of a Section 371 FECA case is an intent on the part of the defendant to thwart the

FEC." *Federal Prosecution of Election Offenses, Eighth Edition*, p. 94, available at

https://www.justice.gov/criminal/file/1029066/dl.

63.     The Government's allegations concerning the FEC filings, including the

designation of Zynda as treasurer, lack evidence of intent to obstruct or impede the

FEC's lawful functions. The FEC's own guidance concerning treasurers emphasizes

that a committee treasurer's role is administrative, focused on ensuring the

accuracy and timeliness of reports, authorizing expenditures, and maintaining

compliance with federal law. https://www.fec.gov/updates/committee-treasurers-

2017-record/ The filings naming Zynda as treasurer were routine compliance

measures and did not indicate any effort to deceive or obstruct the FEC.

64.     The materiality of the alleged misrepresentations were also insufficient to

sustain the charge. To meet the materiality standard, a misrepresentation must

have the capacity to influence the FEC's decision-making or its ability to regulate

campaign finance. *See United States v. Gaudin*, 515 U.S. 506, 509 (1995). Here, the

filings naming Zynda as treasurer did not mislead the FEC or obstruct its oversight

functions, as the agency retained full authority to monitor the PAC's compliance.

Moreover, the PAC regularly communicated with the FEC, whenever contacted.

65.     Furthermore, the solicitations at issue were protected by the First

Amendment. The Government alleged that the omission of Clarke's July 21, 2017,

public statement that he would not run for Senate rendered the solicitations

misleading. However, political fundraising speech is afforded the highest

constitutional protection. See *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). Counsel

should have argued that the Government's theory criminalized protected speech by

requiring disclaimers that conflict with the PAC's core advocacy, thereby violating

the compelled speech doctrine. See *Riley v. National Federation of the Blind*, 487

U.S. 781, 795 (1988). Indeed, Daly's own counsel texted Daly that he did not believe

Daly had participated in a conspiracy, and acknowledged that the plea required

Daly to admit facts that were inconsistent with what Daly believed to be factually

and legally true.

**Subground (d):    Counsel Failed to Advise Daly About the Due Process
                    Clause's "Fair Warning" Requirement as a Defense**

66.     Daly argues that his counsel provided ineffective assistance by failing to

evaluate and advise him about a potential defense based on the Due Process

Clause's "fair warning" requirement. The Due Process Clause prohibits the

government from prosecuting individuals under statutes that do not provide

adequate notice that specific conduct is criminal. See *United States v. Lanier*, 520

U.S. 259, 265 (1997). This principle ensures that individuals are not held criminally

liable for conduct that lies in a regulatory or statutory gray area.

67.     The Government's charges against Daly rested on a novel application of fraud statutes to omissions in political speech and routine administrative filings. The alleged omissions in the Draft PAC's solicitations and filings with the Federal Election Commission (FEC) occurred in a regulatory framework that lacked clear guidance or precedent indicating that such conduct could give rise to criminal liability. Counsel failed to investigate this due process defense, which could have been used to challenge the Government's reliance on ambiguous legal standards.

68.     The Supreme Court has repeatedly emphasized that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling v. United States*, 561 U.S. 358, 410 (2010). Here, the government's case relied on an expansive interpretation of fraud statutes, stretching § 371 conspiracy law to encompass omissions in protected political speech and nominal treasurer designations in FEC filings.

69.     Counsel's failure to investigate and advise Daly about the fair warning defense constitutes deficient performance under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reasonable attorney would have recognized that the ambiguity surrounding the criminality of Daly's conduct rendered the Government's charges vulnerable to constitutional challenge.

70.     Daly was prejudiced by counsel's failure to advise Daly about the due process fair warning defense. Under *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), prejudice in this context requires a reasonable probability that Daly would have proceeded to trial rather than pleading guilty if properly advised. Daly's expressed doubts about

the validity of the plea, coupled with the novel and ambiguous nature of the government's charges, strongly support this conclusion.

71.     By failing to advise Daly about the Due Process Clause's fair warning requirement and its application to his case, counsel deprived him of a critical defense. This failure left Daly unable to fully evaluate the constitutional weaknesses in the government's case. Had Daly been properly advised, he would not have pleaded guilty and proceeded to trial instead.

**Ground Two:**     **Counsel was Ineffective for Failing to Fully Advise Daly About the Risks and Benefits of Withdrawing His Plea Before it Was Accepted by the District Court**

72.     Daly contends that his counsel provided ineffective assistance by failing to provide him with the information necessary to make an informed decision about whether to withdraw his guilty plea. Although Daly was aware of his right to withdraw under Federal Rule of Criminal Procedure 11(d)(1), counsel's failure to fully explain the strength of his available defenses, particularly under the First and Fifth Amendments, left Daly unable to meaningfully evaluate his options.

73.     Rule 11(d)(1) permits a defendant to withdraw a guilty plea for any reason, or no reason at all, before it is accepted by the court. At the time Daly entered his plea, the magistrate judge had issued a report and recommendation, but the district court had not yet adopted it. Daly retained the absolute right to withdraw his plea during this period. His expressed reservations about pleading guilty demonstrate that he seriously considered doing so. See Fed. R. Crim. P. 11(d)(1).

74. Daly's decision-making was hampered by counsel's failure to explain the novelty of the Government's charges and their conflict with longstanding First Amendment principles and the Fifth Amendment's due process protections. Government's theory that omissions in the Draft PAC's solicitations rendered them fraudulent marked an unprecedented application of fraud statutes to political speech. Daly's counsel did not adequately explain that this novel approach raised significant constitutional concerns, particularly the chilling effect such charges could have on political fundraising and advocacy.

75. The First Amendment provides robust protections for political speech, including aspirational language in fundraising solicitations. See *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). The Government's theory criminalized omissions in the Draft PAC's messaging, effectively compelling it to include disclaimers about Clarke's public statement that he would not run for Senate. This requirement imposed a content-based regulation of speech that conflicted with the Draft PAC's advocacy and violated the compelled speech doctrine. See *Riley v. National Federation of the Blind*, 487 U.S. 781, 795 (1988).

76. Counsel also failed to highlight the lack of precedent supporting the Government's charges. The novelty of the Government's theory meant that courts had not previously addressed whether omissions in a Draft PAC's messaging could rise to the level of fraud. Daly's counsel could have argued that this untested application of fraud statutes risked chilling legitimate political activity and required heightened scrutiny under the First Amendment.

77.     Additionally, the Due Process Clause prohibits the government from prosecuting individuals under statutes that fail to provide adequate notice that the charged conduct is criminal. See *United States v. Lanier*, 520 U.S. 259, 265 (1997). This principle is particularly important when, as in Daly's case, the government applies fraud statutes in a novel and untested manner to protected political speech and routine administrative filings.

78.     The government alleged that the Draft PAC's solicitations and filings with the FEC constituted a conspiracy to defraud the United States under 18 U.S.C. § 371. However, no clear statutory, regulatory, or judicial guidance indicated that Daly's conduct—omitting Clarke's public statement that he would not run for Senate in Draft PAC solicitations, or filing routine FEC compliance reports—could give rise to criminal liability. It was ineffective assistance not to advise Daly about this additional defense, especially at the critical moment when Daly was deciding whether to withdraw from the plea.

79.     The Supreme Court has emphasized that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling v. United States*, 561 U.S. 358, 410 (2010). Here, the government's application of fraud statutes to the Draft PAC's actions relied on unprecedented legal theories that stretched the bounds of § 371 conspiracy law. Counsel should have advised Daly that the absence of regulatory clarity regarding Draft PAC operations and the inclusion of disclaimers violated Daly's right to fair warning under the Due Process Clause.

80.     In communications with counsel, Daly expressed that he was "50/50" on withdrawing his plea, reflecting his uncertainty about whether to proceed. Counsel's failure to emphasize the constitutional defenses available to Daly, particularly the novelty of the Government's charges, deprived him of critical information needed to make an informed decision.

81.     Counsel's failure to articulate the significance of the First Amendment issues constituted deficient performance under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reasonable attorney would have recognized that the Government's novel theory of fraud created substantial constitutional vulnerabilities that could have been challenged.

82.     But for counsel's ineffectiveness, there is a reasonable probability Daly would have exercised his unilateral right to withdraw his plea before the district court accepted it.

Respectfully submitted,

/s/Brandon Sample